1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26
27
28

**United States District Court**
For the Northern District of California

**NOT FOR CITATION**

IN THE UNITED STATES DISTRICT COURT

FOR THE NORTHERN DISTRICT OF CALIFORNIA

ISELA DIMERY,                                          No. C 10-00481 JSW

        Plaintiff,                              **ORDER RESOLVING CROSS-
                                                        MOTIONS FOR SUMMARY
  v.                                                  JUDGMENT**

RELIANCE STANDARD LIFE INSURANCE
COMPANY, et al.,

        Defendants.

_____/

**INTRODUCTION**

      This matter comes before the Court upon the cross-motions for summary judgment filed

by Plaintiff Isela Dimery ("Dr. Dimery"), and Defendants Reliance Standard Insurance

Company ("Reliance"), and The Genentech Inc., Long Term Disability Insurance Plan (the

"Plan") (collectively "Defendants").[1]  The Court has considered the parties' papers, relevant

legal authority, and the record in this case, and it HEREBY GRANTS, IN PART, AND

DENIES, IN PART, Defendants' motion and GRANTS, IN PART, AND DENIES, IN PART,

Dr. Dimery's motion.

**BACKGROUND**[2]

      Dr. Dimery is a former employee of Genentech, Inc., and she brings this suit to

challenge Defendants' decision to terminate her long term disability benefits under the terms the

_____

     [1]     Dr. Dimery moved, in the alternative, for judgment under Federal Rule of
Civil Procedure 52.  Because Reliance did not state whether it also sought judgment under
Rule 52, the Court addresses the parties' motions under Rule 56.

     [2]     Unless otherwise noted, the facts are undisputed.

Plan. The Plan is governed by the terms of the Employee Retirement Income Security Act of 1974 ("ERISA"), 28 U.S.C. §§ 1001, *et seq.* ERISA allows a participant in an employee benefit scheme to bring a civil action to recover benefits due under the terms of a plan. 29 U.S.C. § 1132(a)(1)(B). Reliance, in turn, has filed a counterclaim for declaratory relief, in which it seeks a declaratory judgment that it is entitled to restitution for past overpayments or a set-off of any payments that it may be required to pay in the future. (Docket No. 13 (Answer and Counterclaim at 7:17-11:9).)

Dr. Dimery is forty-three years old, has an undergraduate degree in Biology, and attended medical school at the University of Washington. She completed a residency in Pediatrics and a fellowship in Pediatric Hematology-Oncology. She also has a Masters Degree in Public Health. (Plaintiff's Ex. 1 (Administrative Record ("AR") at 45, 47).) In March 2005, Dr. Dimery began working at Genentech as an Assistant Medical Director in Bio-Oncology. (AR at 32-33, 47.) Dr. Dimery enrolled in the Plan, which is funded by an insurance policy issued by Reliance (the "Policy"). (AR at 1-28; *see also* Plaintiff's Ex. 2 (AR at 1748-1791).) Matrix Absence Management, Inc. ("Matrix") is the claims administrator for the Policy. (*See, e.g.,* AR at 118, 1780).)

The Policy provides that a claimant is eligible for a monthly benefit if he or she is "Totally Disabled as the result of a Sickness or Injury covered by the Policy," is under the regular care of a doctor, has completed an elimination period, and "submit[s] satisfactory proof of Total Disability" to Reliance. (AR at 17, 1765.) A claimant is considered "Totally Disabled" if, "for the first 24 months for which a Monthly Benefit is payable, [the claimant] cannot perform the material duties of [his or her] regular occupation." (AR at 8, 1757.) "[A]fter a Monthly Benefit has been paid for 24 months," a claimant is considered "Totally Disabled," if he or she "cannot perform the material duties of any occupation. Any occupation is one that [the claimant's] education, training or experience will reasonably allow." (*Id.*) Reliance will consider a claimant Totally Disabled under the "any occupation" clause if the claimant is "capable of only performing the material duties on a part-time basis or part of the material duties on a Full-time basis." (*Id.*)

**A.      Medical and Other Evidence Regarding Dr. Dimery's Claim.**

On May 31, 2005, while she was approximately seven and one half months pregnant, Dr. Dimery was involved in a rear-end automobile accident.  (AR at 728, 1601.)  Dr. Dimery stopped working on August 1, 2005, because of maternity leave, and intended to return to work in November 2005.  (AR at 32-33.)  However, on October 23, 2005, Dr. Dimery underwent an MRI, which revealed anterior spondylolisthesis of L5 and "marked narrowing of the left L5-S1 neural foramen with probable impingement on the exiting L5 nerve root," which "may account for the patient's symptoms" of low back pain and left sciatica.  (AR at 802-803.)  The MRI also disclosed "mild caudal narrowing of the right L5-S1 neural foramen," and "minimal degenerative changes of the L4-L5 disc without central canal stenosis."  (*Id.*)

Thereafter, Dr. Dimery received various forms of treatment to alleviate her symptoms, including nerve root block injections in January and March 2006, physical therapy, aquatic pool therapy and traction.  (*See, e.g.,* AR at 664-667, 1472, 1556.)  Because her symptoms persisted, in April 2006, Dr. Dimery underwent spinal surgery.  (*See, e.g.,* AR at 1193-1196, 1542-1562, 1661-1675.)  In August 2006, Dr. Dimery underwent another nerve root block.  (*See, e.g.,* AR at 185.)

On November 14, 2006, Ubaldo F. Sanchez, Ph.D, prepared a psychological evaluation of Dr. Dimery.  (AR at 1487-1491.)[3]  Dr. Sanchez noted that Dr. Dimery had to "stand up 12 minutes into the evaluation and periodically thereafter.  She appeared to be in pain."  (AR at 1488.)  Dr. Dimery reported that she experienced pain daily and that it ranged in severity from seven to eight, on a ten point scale, and the day before their meeting her pain was at level ten.  (*Id.*)  Dr. Sanchez diagnosed Dr. Dimery with, *inter alia*, pain disorder and back pain.  (AR at 1491.)  Based on his review of her cognitive functions, Dr. Sanchz opined that "Dr. Dimery is able to perform complex tasks.  She is able to tolerate the stressors encountered in a normal working environment.  However, her major problems are of a physical nature.  Therefore, the

---

[3]      According to Dr. Sanchez' report, Dr. Dimery told him that she had been rear-ended when she was three-weeks pregnant.  (*See, e.g.,* AR at 1491.)

United States District Court

For the Northern District of California

United States District Court

For the Northern District of California

1    appropriate medical professional should determine to what extent her physical problems affect

2    her ability to work." (*Id.*)

3         On November 22, 2006, Dr. Clement Jones examined Dr. Dimery during a post-

4    operative visit. (AR at 1131-1132.) Dr. Dimery reported that "physical therapy has been

5    successful." (AR at 1131.) She also reported that "she still feels her left foot is week or

6    'floppy.'" (*Id.*) Dr. Jones noted that an EMG/Nerve conduction study performed on November

7    5, 2006 showed that "[n]eedle EMG studies for both lower extremities were completely normal

8    (in comparison to prior study dated March 15, 2006, which revealed fibrillations and sharp

9    waves in the left gluteus medius and left medial gastrocnemius and bilateral lumbar paraspinal

10   muscles)." (*Id.* at 1132.) "Nerve conduction velocities were also completely normal for

11   bilateral lower extremities and especially showed improvement with normal bilateral tibial H.-

12   reflexes (in comparison to prior study where both tibial H.-reflexes and peroneal F.-waves were

13   not obtainable.) The current study still demonstrates absent bilateral peroneal F.-waves." (*Id.*)

14   In the impression section of his report, Dr. Jones noted that the left lower extremity

15   radiculopathy was "resolving." (*Id.*)

16        On November 29, 2006, Dr. Jane Ahn, of the Stanford Pain Management Center,

17   examined Dr. Dimery. (*See* AR at 1471-1477.) Dr. Dimery reported that, following her

18   surgery, "[h]er symptoms had improved somewhat," her back pain was intermittent, rather than

19   continuous, but the pain got worse with long periods of sitting, and she was only able to sit

20   twenty to forty minutes at a time. (AR at 1472.) Dr. Dimery also reported that she continued to

21   experience some numbness in her left leg and foot. (*Id.*) Dr. Ahn noted that her examination

22   revealed that "[s]trength is 5/5 in the major muscle groups of the lower extremities," with

23   "some slight weakness 4/5 in the left" extensor hallucis longus. (*Id.* at 958, 1474.) Dr. Ahn

24   reported that her examination of Dr. Dimery's back revealed:

25        No tenderness is noted to palpation of the spinous processes in the cervical
          or thoracic spine. There is some tenderness with palpation of the lumber
26        facet joints bilaterally. No paraspinal tenderness is noted. Deep palpation
          of the left sacroiliac joint in an area in which there is a surgical scar
27        reproduces some of her pain. Light touch, pinching, and poking of the left-
          sided low-back scar does not reproduce paresthesias or reproduce her pain.
28        This makes me thin[k] that the pain at the site is in the sacroiliac joint
          rather than from a scar neuroma. No pain is noted with palpation of the

                                                4

United States District Court

For the Northern District of California

bilateral hips, greater trochanters.  Range of motion is descreased with flexion and extension.  Facet loading maneuvers are positive on the right.  Straight leg raise is negative.  Bilateral fabere is equivocal.

(AR at 1474.)  Dr. Ahn also noted her impression that Dr. Dimery "has a chronic left L5 radiculopathy."  (*Id.*)

Reliance requested that Dr. Dimery undergo an Independent Medical Examination ("IME") with Dr. Paul Mills, a board certified orthopedic surgeon.  (AR at 1374-1390.)  Dr. Dimery met with Dr. Mills on January 16, 2007.  Dr. Mills reported that, during the examination, Dr. Dimery "ambulated with a normal heel and toe gait, which was somewhat broad-based and slow, but without assistive devices" and "appeared to sit in no rigid or fixed posture throughout the interview and would stand on request to demonstrate location of pain, etc."  (AR at 1377.)  Dr. Mills also reported that straight leg testing was negative.  (*Id.*)

> Fabere testing with the hips flexed 100 degrees and abducted 30 degrees revealed 30 degrees of internal rotation and 45 degrees of external rotation bilaterally.  There was no pain in the groin or traveling into either lower extremity, however, there was upper buttock or bilateral lower back pain with this maneuver on both right and left sides.
> ...
>
> Dr. Dimery demonstrated a squat to an angle of approximately 90 degrees at the knees and was able to rise directly to an upright position from there....
>
> While standing or changing position Dr. Dimery was observed to initially stand somewhat forward flexed at the waist and also with some knee flexion, which she reported was her position of most comfort.  From an upright position Dr. Dimery flexed forward at the waist bringing her fingers to approximately the level of her knees.  This did not reverse her lumbar lordosis, but did result in discomfort particularly with flexion attempts beyond this level.  Side bending was at least 30 degrees bilaterally and unassociated with any complaints of pain.  Extension at the waist was 20 degrees and there was pain at end range.  At rest and with position changes there was no lumbar spasm.  There were no isolated trigger points with soft touch applied sufficient to cause skin blanching and no fasciculations were noted about the back or into the lower extremities.  There was no muscular asymmetry appreciated in the lower extremities.
> ...
>
> This completed the physical examination of Dr. Dimery.... There were no appreciable neurovascular abnormalities in the lower extremities at the time of this exam including symmetric sensation and symmetric motor strength with equal reflexes and no pathological reflexes.  Dr. Dimery's posture and ambulation was as described above and not mentioned but present was frequent vocalizations of discomfort with postural changes, etc.  It will be noted that these vocalizations were notably absent in a postoperative visit some months after her surgery in 2006....

5

United States District Court

For the Northern District of California

...

> Certainly, based on the results of my evaluation, Dr. Dimery's physical behavior has become more consistent with her subjective complaint pattern, although fortunately neurologically Dr. Dimery's exam is essentially normal. What is limiting Dr. Dimery at this point in time is her subjective complaints and experience of pain. I don't believe additional surgery is indicated or more exactly put, I don't believe additional surgical intervention is going to be of any benefit for Dr. Dimery.
> ...
> It is my personal opinion that Dr. Dimery would benefit from returning to work if for no other reason than for the distractions that work provides all of us and particularly those individuals with chronic pain.

(AR at 1377-1388.)

Dr. Mills also noted that he could not "explain from a physiological standpoint" why Dr. Dimery's symptomology began to get worse more than four to five months after her surgery. (AR at 1389.) He noted that Dr. Dimery's diagnoses were "back pain with radiculopathy into the left lower extremity and spondylolisthesis with degenerative and extensive disc and joint changes at the L5-S1 level and to a lesser extent the L4-5 level leading to electrodiagnostic findings of radiculopathy and also leading to the surgery intervention." (*Id.*) Dr. Mills opined that Dr. Dimery's

> limitations revolve around her endurance and specifically her ability to sit, which I would expect her subjective response would be approximately 20 to 30 minutes before pain becomes distracting. Standing would be 30 to 60 minutes based on the review of the records and Dr. Dimery could be allowed to change positions from sitting to standing as comfort permits. At this point in time, however, Dr. Dimery's diagnosis may need to be reconsidered inasmuch as she is not responding as expected to the surgical intervention, which must raise consideration that the original diagnosis is incorrect.

(*Id.* at 1389-1390.)

On February 21, 2007, after having reviewed the IME, Leslie Kennedy-O'Neill, R.N., issued a report to Reliance and concluded that "[m]edical supports sedentary" restrictions and limitations "with ability to change position as needed." (*Id.* at1354.) On March 5, 2007, David E. Lembach, a Vocational Rehabilitation Specialist, opined that based on Nurse O'Neill's report, Dr. Dimery was restricted from performing "her occupation of Biochemist, an occupation of light exertional demand." (*Id.* at 1348.)

On September 6, 2007, Matrix sent Dr. Dimery a letter stating that it was "beginning to review [her] eligibility for benefits beyond January 21, 2008," and asked Dr. Dimery to complete a disability questionnaire. (AR at 118-123; *see* AR at 535 (second request dated October 4, 2007).) Dr. Dimery completed the questionnaire on or about October 3, 2007. (*See* AR at 518-533.) Dr. Dimery reported that, with the exception of washing her car, she was unable to perform the household activities listed on the questionnaire, which included, *inter alia*, grocery shopping, cooking, and cleaning. She did state that she was able to drive for less than an hour, was able to walk for a mile or two, could walk up stairs, and worked with a trainer two to three times a week to increase her body strength. She also noted that she could not go shopping at a mall and when she socialized, she could only do it for less than two hours and had to change positions frequently. (AR at 528-530.)

On January 7, 2008, Priska Lee, R.N., Reliance's medical consultant, reviewed Dr. Dimery's updated medical records and the disability questionnaire and concluded that, as of January 22, 2008, Dr. Dimery should at least be able to perform "any" occupation if not her own occupation. (AR at 1321.) Nurse Lee also noted that "[m]edical does not support impairment from light level of work as indicated in her DOT," and noted that a vocational rehabilitation "specialist's re-evaluation for any [occupation] as well as" Dr. Dimery's "own [occupation] is needed." (*Id.*)

On February 11, 2008, Mr. Lembach conducted a Residual Employability Analysis ("REA") and identified other occupations that Dr. Dimery could perform based upon her identified restrictions and limitations, all of which were occupations of light exertional demands. (AR at 477-478.)

On May 30, 2008, an Administrative Law Judge ("ALJ") awarded Dr. Dimery Social Security Disability benefits ("SSDI benefits") and found that she had been disabled since July 25, 2005, due to degenerative disc disease and pain disorder. (AR at 1245-1255.)

On November 25, 2008, as part of Dr. Dimery's appeal, Dr. Richard Kaplan, who is board certified in Physical Medicine and Rehabilitation and Pain Management, reviewed, *inter alia*, Dr. Dimery's medical records, the disability questionnaire, the ALJ's decision, and

1    materials from Dr. Dimery's attorney.  (AR at 948-963.)  Dr. Kaplan opined that Dr. Dimery

2    was not totally disabled "simply by virtue of her pain," that it would be therapeutic for her to

3    return to work, and that she could "return to full time gainful employment" with certain

4    limitations.  (AR at 958.)

5         Reliance also conducted surveillance of Dr. Dimery between November 20-22, 2008 and

6    on November 28, 2008.  (AR at 967-983, 986 (CD-ROM of Surveillance).)  The report of the

7    surveillance indicates that Dr. Dimery "walked with a steady gait with no evidence of a limp or

8    any difficulty," bent over, and "climbed in and out of her vehicle several times with no apparent

9    problems."  (AR at 968-969, 973, 980.)

10        As part of the appeal process, Reliance also asked for a second REA.  Jody Barach

11   completed the REA on December 26, 2008, and opined that Dr. Dimery could perform several

12   occupations that fell within the sedentary exertion level.  (AR at 917-921.)

13   **B.    Procedural History of Dr. Dimery's Claim.**

14        On December 15, 2005, Dr. Dimery filed her claim for disability benefits, on the basis

15   of low back pain as a result of the automobile accident.  (AR at 43-47.)  On March 27, 2006,

16   Matrix determined that Dr. Dimery met the Policy's definition of Total Disability.  (AR at 246-

17   250.)  Matrix advised Dr. Dimery that she would reach the twenty-fourth month of benefits in

18   January 2008 and that it would begin to investigate whether she continued to meet the Policy's

19   definition of Total Disability before then.  (AR at 249.)

20        On February 12, 2008, Matrix notified Dr. Dimery that, based on the available medical

21   and occupational information, it was terminating her benefits effective January 21, 2008.  (AR

22   at 494-497.)  Matrix concluded that Dr. Dimery was no longer "Totally Disabled," because

23   "[t]he medical records in your file do not support impairment from any occupation."  (AR at

24   495.)  Matrix also advised Dr. Dimery that it had determined that her "own occupation at your

25   date of loss was classified as 'Light,'" Dr. Dimery had "transferable skills," and that Matrix had

26   identified several other occupations with "Light" exertional duties that she could perform.  (AR

27   at 495.)

28

**United States District Court**
For the Northern District of California

On August 27, 2008, Dr. Dimery appealed the decision to terminate benefits.[4]  (*See* AR at 1189-1320.)  Dr. Dimery asked Reliance to defer its review, because she was in process of obtaining additional medical records and evidence to support her claim, which she expected to receive within two weeks.  Dr. Dimery, through counsel, advised Reliance that "we will reciprocally extend Reliance['s] time within which to make its decision on Dr. Dimery's appeal as per the applicable Department of Labor Guidelines."  (*Id.* at 1190.)

On September 26, 2008, Dr. Dimery again asked for an extension of time to obtain further information in support of her appeal and again advised Reliance that she would be willing to extend the same courtesy to Reliance, if required.  (AR at 470-471.)  On October 22, 2008, Dr. Dimery requested another extension, which Reliance granted on the condition that Dr. Dimery would also grant Reliance an extension if it required additional time.  (*Id.* at 467, 469.)  On November 6, 2008, Dr. Dimery submitted additional information to Reliance and requested that it begin its review of her appeal.  (*Id.* at 999-1188.)

On November 18, 2008, Reliance notified Dr. Dimery that it "will require a review of the medical evidence by an independent physician, prior to the conclusion of our assessment."  (AR at 468.)

On January 9, 2009, Reliance notified Dr. Dimery that it had denied her appeal, finding that "the information does not substantiate a physical or mental health condition that was at a level of severity, which would preclude [Dr.] Dimery from performing the Full-time material duties of a sedentary occupation."  (*Id.* at 412-419.)

The Court shall address additional facts as necessary to the analysis.

## ANALYSIS

**A.    Applicable Legal Standards on Motion for Summary Judgment.**

Summary judgment is proper when a "movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). "A party asserting that a fact cannot be or is genuinely disputed must support the

---

[4]    It is undisputed that Dr. Dimery filed a timely appeal, based on her request for a thirty-day extension, which Reliance granted.  (AR at 1189.)

assertion by" citing to, *inter alia*, depositions, documents, affidavits, or other materials.  Fed. R. Civ. P. 56(c)(1)(A).  A party may also show that such materials "do not establish the absence or presence of a genuine dispute, or that an adverse party cannot produce admissible evidence to support the fact."  Fed. R. Civ. P. 56(c)(1)(B).  An issue is "genuine" only if there is sufficient evidence for a reasonable fact finder to find for the non-moving party.  *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248-49 (1986).  A fact is "material" if the fact may affect the outcome of the case.  *Id.* at 248.  "In considering a motion for summary judgment, the court may not weigh the evidence or make credibility determinations, and is required to draw all inferences in a light most favorable to the non-moving party."  *Freeman v. Arpaio*, 125 F.3d 732, 735 (9th Cir. 1997).

The party moving for summary judgment bears the initial burden of identifying those portions of the pleadings, discovery, and affidavits which demonstrate the absence of a genuine issue of material fact.  *Celotex Corp. v. Cattrett*, 477 U.S. 317, 323-24 (1986).  Where the moving party will have the burden of proof on an issue at trial, it must affirmatively demonstrate that no reasonable trier of fact could find other than for the moving party.  *Id.*  Once the moving party meets this initial burden, the non-moving party must go beyond the pleadings and by its own evidence set forth specific facts showing that there is a genuine issue for trial.  *See* Fed. R. Civ. P. 56(e).  The non-moving party must "identify with reasonable particularity the evidence that precludes summary judgment."  *Keenan v. Allan*, 91 F.3d 1275, 1279 (9th Cir. 1996) (quoting *Richards v. Combined Ins. Co.*, 55 F.3d 247, 251 (7th Cir. 1995)) (stating that it is not a district court's task to "scour the record in search of a genuine issue of triable fact").  If the non-moving party fails to make this showing, the moving party is entitled to judgment as a matter of law.  *Celotex*, 477 U.S. at 323.

**B.     Standard of Review.**

As a threshold matter, the parties do not agree on the proper standard of review.  In general, courts review a denial of benefits challenged under Section 1132(a)(1)(B) "under a *de novo* standard unless the benefit plan gives the administrator or fiduciary discretionary authority to determine eligibility for benefits or to construe the terms of the plan."  *Firestone Tire &*

United States District Court

For the Northern District of California

1   *Rubber Co. v. Bruch,* 489 U.S. 101, 115 (1989); *see also Metropolitan Life Ins. Co. v. Glenn*,

2   554 U.S. 105, 111 (2008) ("*Glenn*").  However, when the administrator has such discretionary

3   authority, the district court applies the deferential abuse of discretion standard.  *Glenn*, 554 U.S.

4   at 111; *Burke v. Pitney Bowes, Inc. Long-Term Disability Plan*, 544 F.3d 1016, 1023-24 (9th

5   Cir. 2008).

6          **1.**        **The Abuse of Discretion Standard Applies in this Case.**

7        The Policy provides that:

8        Reliance Standard Life Insurance shall serve as the claims review fiduciary
         with respect to the insurance policy and the Plan.  The claims review

9        fiduciary has the discretionary authority to interpret the Plan and the
         insurance policy and to determine eligibility for benefits.  Decisions by the

10       claims review fiduciary shall be complete final and binding on all parties.

11  (AR at 13.)  This language is sufficient to vest discretion in Reliance.  *See Abatie v. Alta Health*

12  *& Life Ins. Co.*, 458 F.3d 955, 963-65 (9th Cir. 2006); *Jebian v. Hewlett-Packard Co. Employee*

13  *Benefits Org. Income Protection Plan*, 349 F.3d 1098, 1103 (9th Cir. 2003).

14       Dr. Dimery argues that, notwithstanding this language, the Court should apply a *de novo*

15  standard of review.  First, she argues that Matrix was not vested with any discretion under the

16  terms of the Policy.  The Court finds this argument unpersuasive.  The provisions of the ERISA

17  statute expressly provide "for named fiduciaries to designate persons other than named

18  fiduciaries to carry out fiduciary responsibilities (other than trustee responsibilities) under the

19  plan."  29 U.S.C. § 1105(c)(1)(B); *see also Madden v. ITT Long Term Disability Plan for*

20  *Salaried Employees*, 914 F.2d 1279, 1283-85 (9th Cir. 1990).  The Claims Provision portion of

21  the Policy provides that the notice of a claim for benefits should be sent to Reliance "or to our

22  authorized agent."  (AR at 13, 1761.)  The Summary Plan Description, in turn, provides that

23  claims should be submitted to Matrix.  (AR at 1780.)  In addition, after Dr. Dimery submitted

24  her claim, Matrix sent her a letter, in which it identified itself as the "claims administrator" for

25  the Policy.  (*Id.* at 118.)

26       As such, the Court concludes that although Matrix made the initial decision to terminate

27  Dr. Dimery's benefits, that fact does not require application of a *de novo* standard of review.

28  *Madden*, 914 F.2d at 1283-85; *cf. Geddes v. United Staffing Alliance Employee Med. Plan*, 469

*United States District Court*
For the Northern District of California

1  F.3d 919, 924-26 (10th Cir. 2006) ("If a plan administrator has been allotted discretionary

2  authority in the plan document, the decisions of both it and its agents are entitled to judicial

3  deference.").

4          Second, Dr. Dimery argues that the *de novo* standard should apply because Reliance did

5  not act on Dr. Dimery's appeal within forty-five days and, thus, the appeal should be deemed

6  denied.  The Court also finds this argument unpersuasive.  In *Abatie*, the Ninth Circuit noted

7  that "an administrator's failure to comply with ... procedural requirements ordinarily does not

8  alter the standard of review."  *Abatie*, 458 F.3d at 971 (citing *Gatti v. Reliance Std. Life Ins.*

9  *Co.*, 415 F.3d 978, 985 (9th Cir. 2003)).  "There are, however, some situations in which

10 procedural irregularities are so substantial as to alter the standard of review."  *Id.*  Specifically,

11 where "the violations are so flagrant as to alter the substantive relationship between the

12 employer and employee thereby causing the beneficiary substantive harm."  *Gatti*, 415 F.3d at

13 985.

14         The *Jebian* case, on which Dr. Dimery relies, presents one such situation.  There, the

15 defendant failed to render a decision on the plaintiff's claim for benefits until after he had filed

16 suit, which was well after the time period provided for in the regulations applicable to ERISA

17 and after the time period provided by the terms of the plan.  *Jebian*, 349 F.3d at 1102-1103.

18 Moreover, the plain language of the plan at issue provided that this procedural violation would

19 result in an automatic decision, *i.e.* it would be deemed denied.  The Ninth Circuit concluded

20 that a claim that has been "deemed denied" cannot constitute a valid exercise of discretion.  *Id.*

21 at 1105-06; *see also id.* at 1103.  Thus, it concluded that *de novo* review was appropriate.  In

22 contrast, in the *Abatie* case, the Ninth Circuit concluded that the facts did not fall within "that

23 rare class of cases," where "an administrator engages in wholesale and flagrant violations of the

24 procedural requirements of ERISA...."  458 F.3d at 971-72.  There, the administrator, in its final

25 decision, offered a new reason for denying plaintiff's claim.  Although the court concluded that

26 this procedural violation was not the type of violation that required *de novo* review, it did find

27 that the district court should have weighed the procedural violation as a factor in determining

28 whether the defendant abused its discretion.  *Abatie*, 458 F.3d at 974.

United States District Court
For the Northern District of California

1    The Court finds that this case is not one of those "rare" cases where procedural

2    violations require application of the *de novo* standard of review.  Reliance was required to

3    notify Dr. Dimery of its benefit determination no later than forty-five days after it received her

4    appeal, unless Reliance determined that "special circumstances" required an extension of time.

5    (AR at 1781-82, 1785.)  If Reliance determined that an extension was required, it need to

6    provide written notice of the extension to Dr. Dimery "prior to the termination of the initial 45-

7    day period.  In no event shall such extension exceed a period of **45** days from the end of the

8    initial period."  (AR at 1785.)  In addition, Reliance also was required to indicate the special

9    circumstances that required the extension and the date by which it expected to render a

10   determination.  (*Id.*)  These provisions of the Plan are in accordance with ERISA regulations.

11   *See* 29 C.F.R. §§ 2560.503-1(i)(1)(1), 2560.503-1(3)(i), 2560.503-1(4).  Further, unlike the plan

12   at issue in the *Jebian* case, the Plan does not contain any language that a failure to strictly abide

13   by these time frames will result in the claim being deemed denied.  *See Jebian*, 349 F.3d at

14   1102-03; *Hinz v. Hewlett-Packard Corp. Disability Plan*, 2011 WL 1230046, at *4 (N.D. Cal.

15   Mar. 30, 2011) (distinguishing *Jebian*, in part, on basis that plan did not contain "deemed

16   denied" language).

17        Sixty-four days elapsed between November 6, 2008, when Reliance began its review of

18   Dr. Dimery's appeal, and January 9, 2009, when Reliance denied the appeal.  Thus, if Reliance

19   properly notified Dr. Dimery of its need for additional time, it rendered its decision within the

20   ninety day period provided for in the Plan and Section 2560-503.1(i).  On November 18, 2008,

21   Reliance sent Dr. Dimery a letter in which it advised her that it needed an independent

22   physician to review the medical evidence.  (AR at 468.)  Reliance did not state when it expected

23   to render a decision, but it did advise Dr. Dimery that "[o]nce we receive the independent

24   physician's report and have an opportunity to review it with our medical staff, we will update

25   you or inform you should we require additional information."  (*Id.*)  Reliance neither requested

26   an extension of time to process the appeal nor referenced Dr. Dimery's willingness to grant it an

27   extension if required.  (*Id.* at 467-471, 1190.)

28

At best, Reliance failed to explicitly request an extension of time to decide the appeal; a request that Dr. Dimery had previously stated that she would grant.  The Court concludes that this is not the type of "wholesale or fragrant violation[] of the procedural requirements of ERISA," that could result in a finding that Reliance acted in "utter disregard of the underlying purpose of the plan...."  *Abatie*, 458 F.3d at 972.

Accordingly, the Court finds that the abuse of discretion standard applies and GRANTS, IN PART, Defendants' motion and DENIES, IN PART, Dr. Dimery's motion on this basis.

### 2.      The Meaning of Abuse of Discretion.

As the Supreme Court recently stated, "[a]pplying a deferential standard of review does not mean that the plan administrator will prevail on the merits.  It means only that the plan administrator's interpretation of the plan "'will not be disturbed if reasonable.'"  *Conkright v. Frommert*, 130 S.Ct. 1640, 1651 (2010) (quoting *Firestone*, 489 U.S. at 111).  When court reviews denials by administrators, it is "to determine lawfulness by taking account of several different, often case-specific, factors," including any conflict of interest and procedural violations, "reaching a result by weighing all together,'"  *Glenn*, 554 U.S. at 117.  After taking into account all the facts and circumstances, the court must determine whether a decision to deny benefits is reasonable.  *Salomaa v. Honda Long Term Disab. Plan*, 642 F.3d 666, 675 (9th Cir. 2011).

> Reasonableness does not mean that we would make the same decision. We must judge the reasonableness of the plan administrator skeptically where, as here, the administrator has a conflict of interest.  Even without the special skepticism we are to apply in cases of conflict of interest, deference to the plan administrator's judgment does not mean that the plan prevails.
>
> ...
>
> [T]he test for abuse of discretion in a factual determination (as opposed to legal error) is whether [a court is] left with a definite and firm conviction that a mistake has been committed," and [it] may not merely substitute [its] judgment for that of the fact finder.  To do so, [it] consider[s] whether application of a correct legal standard was "(1) illogical; (2) implausible; and (3) without support in inferences that may be drawn from the facts in the record."

*Id.* at 675-76 (quoting *United States v. Hinkson*, 585 F.3d 1247, 1262 (9th Cir. 2009) (en banc)).

United States District Court

For the Northern District of California

**C.    Reliance Has Met Its Burden to Show It is Entitled to Summary Judgment on Dr. Dimery's Claim for Benefits.**

As discussed above, a claimant is considered "Totally Disabled," and eligible for benefits, if she is unable to perform her "regular" occupation for an initial period of twenty-four month.  (AR at 8, 1757.)  It is undisputed that Dr. Dimery met this condition and received benefits from January 21, 2006 through January 21, 2008.  At issue is whether Reliance abused its discretion when it determined that Dr. Dimery did not remain "Totally Disabled" after January 21, 2008.  Reliance concluded that the medical evidence did "not substantiate a medical or health condition that was at a level of severity, which would preclude [Dr.] Dimery from performing the Full-time material duties of a sedentary occupation."  (AR at 412-413.)[5] Reliance stated it did not dispute that Dr. Dimery "may have ongoing symptoms of low back pain," but it took the position "that the level of the severity of her condition does not preclude her from sedentary work function."  (AR at 415.)

**1.    Medical Evidence.**

The Court begins by examining the medical evidence.  Dr. Dimery argues that the opinions of Dr. Reynolds, Dr. Jones, Dr. Wilcosky, Dr. Mills and Dr. Sanchez all support a finding that she was Totally Disabled under the Policy.  She also refers the Court to MRI scans, the results of nerve root injection procedures, an EMG/Nerve conduction study, reports that show muscle weakness in her left leg and other physical symptoms, and a vocational report that Matrix prepared.  (AR at 185, 761-762, 1000-1003, 1252, 1348, 1388, 1434-1438, 1444-1446,

_____

[5]       Reliance relied on the definitions of sedentary and light employment set forth in the Dictionary of Occupational Titles, 4th Edition.  The parties agree that Dr. Dimery's "regular" occupation fell within the "light" exertion level.  Employment is considered to fall within the "light" exertional scale when it, *inter alia*, "requires walking or standing to a significant degree; or when it requires sitting most of the time, but entitles pushing and/or pulling of arms or leg controls...."  (AR at 478.)  *Cf.* 20 C.F.R. 404.1567(b) ("a job is in this category when it requires a good deal of walking or standing, or when it involves sitting most of the time with some pushing and pulling of arm or leg controls").

In contrast, "[s]edentary work involves sitting most of the time, but may involve walking or standing for brief periods of time.  Jobs are sedentary if walking and standing are required only occasionally and all other sedentary criteria are met."  (*See* AR at 478.)  *Cf.* 20 C.F.R. § 404.1567(a) ("Jobs are sedentary if walking and standing are required occasionally and other sedentary criteria are met.").

15

United States District Court
For the Northern District of California

United States District Court

For the Northern District of California

1474, 1487-1491, 1527-1528, and 1556).)  Much of this evidence pertains to the initial twenty-four month period of the Policy, when Dr. Dimery was required to show she was not able to perform her "regular" occupation rather than "any occupation."  (*See, e.g.,* AR at 135, 761-762, 1348, 1388, 1434-1438, 1444-1446, 1474, 1487-1491, 1527-1528, and 1556.)[6]  Dr. Dimery's regular occupation required her to function at a light exertional level, which requires at least some sitting and standing.  Thus, to the extent Reliance concluded that Dr. Dimery could perform a sedentary occupation, the medical evidence that supported a conclusion that she could *not* perform her regular occupation has some bearing on whether she could perform any occupation.  At the same time, the parties do not really dispute the extent of Dr. Dimery's physical condition. Rather, the crux of their disagreement is whether the pain Dr. Dimery claims to experience is so severe that it has rendered her "Totally Disabled," under the terms of the Policy.

Medical evidence produced during the initial twenty-four month period showed that "[n]eedle EMG studies for both lower extremities were completely normal," in comparison to the study conducted before Dr. Dimery had surgery.  (AR at 1132.)  Similarly, both Dr. Ahn, in November 2006, and Dr. Mills, in January 2007, reported that the straight leg test was "negative."  (AR at 1377, 1474.)  In contrast, there are reports that when Dr. Dimery saw Dr. Wilcosky in January 2007, the straight leg test was positive.  (*See, e.g.,* AR at 950, 1253.)

Medical evidence produced after January 21, 2008, also is not inconsistent with Reliance's conclusion that Dr. Dimery could perform sedentary work.  For example, an EMG study dated May 16, 2008, reports a "normal examination" and "[n]o confirmation of L/S radiculopathy."  (AR at 1087-1090.)  Reliance also refers the Court to a report prepared by Dr. Jones, in April 2008, in which Dr. Jones opined that her spinal fusion was solid.  (AR at 1099-1100.)  Dr. Jones also noted that Dr. Dimery reported that she could tolerate sitting for 40 minutes and standing for one hour, that her pain was between two and four on a ten-point scale

---

[6]     Dr. Dimery's citation to AR 1252 is a portion of the ALJ's decision, and that page discusses Dr. Sanchez' opinion as well as other medical evidence.

of severity, and that she worked with a personal trainer two to three times a week.  Dr. Jones also stated his impression that Dr. Dimery had Chronic Pain Syndrome.  (AR at 1000.)

With respect to the evidence of pain, Dr. Sanchez noted in his report from November 2006, that Dr. Dimery appeared to be in pain.  Yet, he opined that Dr. Dimery "is able to tolerate the stressors encountered in a normal working environment."  (AR at 1491.)  Thus, to the extent Dr. Dimery asserts that her pain prevents her from working altogether, Dr. Sanchez' opinion suggests otherwise.

On January 16, 2007, Dr. Mills noted that Dr. Dimery's "pain behavior is increasing in spite of no change in objective physiological findings...."  (AR at 1389.)  He also noted that Dr. Dimery's limitations revolved around her ability to sit, and stated that he expected "*her subjective response* would be approximately 20 to 30 minutes before pain becomes distracting."  (*Id.* (emphasis added).)  Dr. Mills also concluded, based on medical records, that Dr. Dimery could stand for periods of thirty to sixty minutes and could be allowed to change positions from sitting to standing as comfort permits.  (*Id.*)  Moreover, Dr. Mills noted that, in general, "people with sedentary jobs who are not on narcotic medication and are not at risk for damaging their surgery, ... are capable of resuming their sedentary occupation if in fact they are allowed to change positions as necessary for comfort and as long as they are not finding the need for mind-altering chemicals, be that narcotics or others."  (*Id.*)  Dr. Dimery does not point to any evidence that returning to a sedentary occupation could damage her surgery, and Dr. Jones report in April 2008 expressly notes that her fusion was "solid."  (AR at 1000.)  Dr. Dimery also does not suggest that she was on any type of narcotic or mind-altering medication that would interfere with her ability to work.  The Court cannot say that Dr. Mills' opinion is inconsistent with the conclusion that Dr. Dimery could perform sedentary work.

Dr. Wilcosky's report, dated October 23, 2008, also addresses Dr. Dimery's complaints of pain and provides the most support for Dr. Dimery's argument that she is not capable of performing any occupation.  (AR at 1000-1003.)  In Dr. Wilcosky's view, Dr. Dimery had reached "maximum medical improvement."  (AR at 1001.)  Dr. Wilcosky also opined that her regular position as a medical researcher was a "high pressure position."  (AR at 1002.)  Because

1   "stress acts as a significant pain amplifier," he opined that "it is unlikely that she could perform

2   in that capacity for any significant length of time." (*Id.*)  He also opined that it was likely tht

3   her pain would impact her reliability and that "[o]n bad days she may not be capable of working

4   at all, while on other days she may be capable of at least some performance." (*Id.*)  Dr.

5   Wilcosky also noted that Dr. Dimery was limited physically in her ability to work because of

6   "her need to change positions frequently, alternating from sitting to standing at intervals not to

7   exceed thirty minutes...." (*Id.*)

8          An ERISA plan administrator is not required to defer to the opinion of a treating

9   physician in the context of making a benefits determination.  *See Black & Decker Disability*

10  *Plan v. Nord*, 538 U.S. 822, 833 (2003).  When it denied Dr. Dimery's appeal, Reliance did not

11  directly discuss Dr. Wilcosky's opinion, other than to "acknowledge[] that [Dr.] Dimery

12  continued to seek treatment for her ongoing complaints of low back pain through at least"

13  August 2008. (AR at 415.)  Reliance also noted that "treatment for a medical condition, in and

14  of itself, does not necessarily preclude work function." (*Id.*)

15         However, Reliance did rely on Dr. Kaplan's report, and Dr. Kaplan agreed with Dr.

16  Wilcosky that complaints of pain are subjective in nature.  (*Compare* AR at 1002 *with* AR at

17  958.)  However, he "disagree[d] with the interpretation that [Dr. Dimery] is by definition totally

18  disabled simply by virtue of her pain." (AR at 958.)  Dr. Kaplan explained that the basis of this

19  opinion was that "among the most fundamental principles of pain management and physical

20  rehabilitation is to maintain and individual's function, including vocational function." (*Id.*)  Dr.

21  Kaplan also agreed with Dr. Mills that "the return to gainful employment is not only possible,

22  but it is likely to be therapeutic for an individual with a history of chronic pain," like Dr.

23  Dimery. (*Id.*)  Thus, in his view, Dr. Dimery could return to work at her "minimum level of

24  physical ability," and suggested that, *inter alia*, that she be permitted to change positions as

25  needed for comfort. (AR at 958-959.)

26         Viewing the facts in the light most favorable to Dr. Dimery, the Court cannot say that a

27  reasonable fact finder could conclude that Reliance abused its discretion when it concluded that

28  the medical evidence showed Dr. Dimery was not Totally Disabled.

## 2.      "Pure Paper" or "In Person Review"

The Court also considers whether Reliance conducted "pure paper" review of Dr. Dimery's appeal to determine whether Reliance abused its discretion. *Montour*, 588 F.3d at 634. In the *Montour* case, the court concluded that the failure to conduct an in-person examination of the plaintiff raised "'questions about the thoroughness and accuracy of the benefits determination,'" because it was not clear that the plan administrator had provided the doctors conducting the paper review with all relevant evidence. 588 F.3d at 634 (quoting *Bennett v. Kemper Nat'l Servs., Inc.*, 514 F.3d 547, 554 (6th Cir. 2008) and citing *Glenn*, 554 U.S. at 118). In particular, the court focused on the fact that "neither of [the defendant's] professional experts mentioned the SSA's contrary conclusion, 'not even to discount or disagree with it, which indicates that [they] may not even have been aware of it.'" *Id.* at 634 (quoting *Glenn v. MetLife*, 461 F.3d 600, 669 (6th Cir. 2006) ("*MetLife I*") and omitting internal quotation marks and alterations)).

Reliance did consider the results of Dr. Mills' in-person IME when it rendered its decision, although Dr. Mills conducted his IME before Reliance began to evaluate whether Dr. Dimery could perform any occupation. However, the record shows that by March 2007, based on that IME, Reliance concluded that the "[m]edical supports sedentary R&L's with ability to change positions as needed." (AR at 118, 130, 135.) Reliance did not examine Dr. Dimery in-person during the appeal process, and Dr. Kaplan conducted a pure paper review. However, there is nothing in the record that suggests Reliance failed to provide Dr. Kaplan with any pertinent material. (*See* AR at 948-958.) Rather, Dr. Kaplan's report shows that he reviewed an extensive amount of Dr. Dimery's medical records and other materials, including materials provided by Dr. Dimery's attorney, as well as the ALJ's decision to award Dr. Dimery SSDI benefits. These facts distinguish this case from *Montour*, and does not give rise to a situation where a reasonable fact-finder could conclude that the failure to examine Dr. Dimery in person during the appeal process raises "'questions about the thoroughness and accuracy of the benefits determination....'" *Montour*, 588 F.3d at 634.

**3.    The Surveillance Video and Dr. Dimery's Credibility.**

The Court also considers the surveillance evidence. *Montour*, 588 F.3d at 633. In the *Montour* case, the plan administrator relied on surveillance evidence in support of its decision to deny benefits. The *Montour* court concluded that the administrator overstated and relied too heavily on surveillance of the plaintiff, when the plaintiff's "observed activity was brief and consistent with [his] self-reported limitations." *Montour*, 588 F.3d at 633. The court also found it significant that the administrator's description of the surveillance was inconsistent with its internal observations as well as its report of an in-home interview of the plaintiff, which demonstrated that plaintiff had showed signs of pain. *Id.*

As both parties requested, this Court has carefully reviewed the CD-ROM of the surveillance, which was submitted as part of the administrative record. Dr. Dimery correctly notes that it does not show her lifting any heavy objects. However, as noted, the focus of the dispute is Dr. Dimery's ability to sit or stand for sustained periods of time. The video shows Dr. Dimery walking, standing, sitting, and getting in and out of her vehicle, and, with one brief exception, Dr. Dimery does not demonstrate any outward signs of pain. On November 28, 2008, while she sits down to have her picture taken, Dr. Dimery grimaces and then pushes with her arms to get to a standing position. (*See* CD-ROM, Nov. 28, 2008 at 2:54:00-2:54:07.)

Reliance denied benefits, in part, on the basis that the results of the surveillance were inconsistent with activities and tasks that Dr. Dimery claimed she was not able to perform. For example, in the disability questionnaire, Dr. Dimery claimed she needed to use a stick to pick things up. (AR at 528.) However, in the surveillance video, Dr. Dimery bends over to retrieve items from her car and squats down on several occasions. She also claimed that she could not go to the mall (AR at 529), but in the surveillance video she is observed at several stores and a Christmas Tree farm. Viewing the facts in the light most favorable to Dr. Dimery, the Court cannot say that a reasonable fact finder could conclude that Reliance overstated the results of the surveillance or that the surveillance evidence is consistent with Dr. Dimery's self-reported limitations.

United States District Court

For the Northern District of California

**4.      The ALJ's Decision and Dr. Dimery's Credibility.**

The Court also considers Reliance's evaluation of the SSA's disability determination. "Social Security disability awards do not bind plan administrators, but they are evidence of disability." *Salomaa*, 642 F.3d at 679 (citing *Montour*, 588 F.3d at 635); *Montour*, 588 F.3d at 635 (citing *MetLife I*, 461 F.3d at 674).  In *Montour*, although the plan administrator acknowledged the SSA decision, the court found it significant to the abuse of discretion analysis that the administrator "did not articulate why the SSA might have reached a different conclusion." *Id.*  In addition, in the *Montour* case, the SSA's definition of disability was more strict than the plan's definition.  *Id.* at 636.  The court also found that this fact supported its conclusion that the plan administrator's conflict of interest motivated the decision to deny benefits and demonstrated an abuse of discretion.  *Id.* at 636.  Similarly, in *Salomaa*, the plan administrator also failed to consider the SSA's decision that the plaintiff was disabled and entitled to benefits.  As in *Montour*, the *Salomaa* court also concluded that "the failure to address it offers support that the plan administrator's denial was arbitrary, an abuse of discretion." *Salomaa*, 642 F.3d at 679.

"Ordinarily, a proper acknowledgment of a contrary SSA disability determination would entail comparing and contrasting not just the definitions employed but also the medical evidence upon which the decisionmakers relied." *Montour*, 588 F.3d. at 636.  In contrast to *Montour*, Reliance both acknowledged the SSA decision in Dr. Dimery's case and offered an explanation as to why it disagreed with that decision.  (AR at 417-418.)  In addition, the record shows that the ALJ and Reliance relied on some of the same materials.  (*Compare* AR at 415-418 *with* AR at 1249-1254.)  The ALJ found Dr. Dimery's testimony about her symptoms to be credible, noting that after conservative treatment failed, she was willing to undergo surgery.  (AR at 1253.)  However, the ALJ rendered his decision in May 2008.  Reliance explained that it reached a different conclusion, in part, because the ALJ did not have access to Dr. Kaplan's report and the surveillance video, which in its view was inconsistent with her self-reported limitations.  (AR at 417-18.)

The plan at issue in *Montour* also required that a claimant apply for social security benefits and required the claimant to refund any benefits to the administrator. *Montour*, 588 F.3d at 637. That fact also impacted the court's conclusion that the administrator abused its discretion. The record here shows that, if not required, Reliance strongly encouraged Dr. Dimery to apply for Social Security benefits. In either event, the Policy provides that Reliance would deduct estimated benefits from her monthly payments per an "Other Income Benefits" provision, discussed in more detail below. (AR at 17, 222-225, 246-250, 308-310.) As in *Montour*, this fact is probative of bias. However, the Court cannot say that, viewing the facts in the light most favorable to Dr. Dimery, that a reasonable fact-finder could conclude that Reliance abused its discretion by disagreeing with the ALJ's conclusions about whether Dr. Dimery was disabled and the conclusions about her credibility.

### 5. The Structural Conflict and Procedural Irregularity.

Neither Reliance nor Dr. Dimery has introduced extrinsic evidence pertaining to the conflict, although the Court permitted discovery on this issue. (Docket No. 35.) Thus, there is no evidence regarding Reliance's rate of claims denials or how frequently Dr. Kaplan, Dr. Mills or the vocational experts conducted reviews for Reliance. *Montour*, 588 F.3d at 634; *Nolan v. Heald College*, 551 F.3d 1148, 1152 n.3 (9th Cir. 2009) (discussing evidence of the number of reviews conducted by particular providers and percentage of income derived from plan administrator). At the same time, Reliance also does not present any extrinsic evidence on the procedures it uses, in general, to ensure neutral and unbiased reviews of claims.

The Court also considers the procedural irregularity discussed in connection with the Court's analysis of the standard of review to determine whether Reliance abused its discretion. *Abatie*, 458 F.3d at 972. In *Salomaa*, for example, the plan did not give the plaintiff or his attorney access to the medical reports on which it relied, failed to advise the plaintiff what additional medical evidence it wanted, and to the extent it did advise plaintiff what medical evidence to submit, it did not do so in a manner that was "calculated to be understood by the claimant." 642 F.3d at 679-80 (citing *Saffon v. Wells Fargo & Company Long Term Disability*

United States District Court

For the Northern District of California

1  *Plan*, 522 F.3d 863, 870 (9th Cir. 2008)).  The court found that these procedural irregularities

2  prejudiced the plaintiff and denied him a full and fair review of his claim.

3  In contrast, in this case, Reliance failed to expressly ask for an extension to issue its

4  decision.  Unlike the irregularities at issue in *Salomaa*, it would not be unreasonable for a fact-

5  finder to conclude that this minor irregularity did not preclude Dr. Dimery from receiving a full

6  and fair review procedure.

7  The Court has reviewed the administrative record, considered relevant factors, and

8  tempered its review with a mild degree of skepticism based on the structural conflict that exists

9  in this case.  Taking the facts in the light most favorable to Dr. Dimery, the Court concludes that

10  no reasonable fact finder could conclude that Reliance abused its discretion when it determined

11  she no longer qualified as Totally Disabled under the terms of the Policy.

12  **D.      Reliance's Counterclaim.**

13  If an ERISA-fiduciary seeks reimbursement of funds that it has paid to a claimant, it

14  must do so through an equitable lien or constructive trust over specifically identifiable funds.  It

15  cannot recover the funds by imposing general personal liability on a claimant.  *See Sereboff v.*

16  *Mid Atlantic Medical Services, Inc.*, 547 U.S. 356, 362-363 (2006); *Great-West Life & Annuity*

17  *Inc. Co. v. Knudson*, 534 U.S. 204, 214 (2002).  However, the Supreme Court also concluded

18  that in a situation where there is an "equitable lien by agreement," an ERISA-fiduciary does not

19  have to strictly trace the proceeds in question.  *Sereboff*, 547 U.S. at 364-65.  Rather, the

20  fiduciary can satisfy its burden by identifying "a particular fund distinct from [the beneficiary's]

21  general assets, and a particular share of that fund to which" it is entitled.  *Id.* at 364.

22  The Policy states that the benefit amount is calculated by subtracting, *inter alia*, "Other

23  Income Benefits" which can include SSDI payments.  (AR at 17-18.)  Dr. Dimery applied for

24  and received SSDI benefits and she signed two reimbursement agreements.  Those agreements

25  provide that Reliance will not deduct SSDI benefits from her LTD benefit, and in return she

26  would "reimburse [Reliance] for the full amount which may be overpaid to me in the event I am

27  awarded" SSDI benefits, "including retroactive awards...."  (*See, e.g.,* AR at 212 .)

28

1    Dr. Dimery asserts that Reliance has not met its burden to strictly trace the proceeds in

2    question, and she attests that she spent the funds in question long ago.  (Declaration of Isela

3    Dimery.)  However, the Court finds that the language of the Policy and the Reimbursement

4    Agreements create an "equitable lien by agreement," and Reliance is not required to strictly

5    trace the proceeds.  *See, e.g., Sereboff*, 547 U.S. at 364; *see also Mertens v. Permanente*

6    *Medical Group Long Term Disability Plan*, 2010 WL 5138815, at *5-6 (N.D. Cal. Dec. 10,

7    2010) (finding that allegations pertaining to plan language and reimbursement agreement were

8    sufficient to state a claim for relief).  Reliance has also identified the specific funds at issue: the

9    SSDI benefits paid to Dr. Dimery and her minor son.  *Id.*

10    Dr. Dimery argues that Reliance is not entitled to recover benefits paid on behalf of her

11    child, relying on *Carstens v. United States Shoe Corp.'s Long-Term Benefits Disability Plan*,

12    520 F. Supp. 2d 1165 (N.D. Cal. 2007.)  However, in the *Carstens* case, the provision at issue

13    stated that an employee's total monthly benefits would be offset by, *inter alia*, "[p]eriod

14    benefits, for loss of time on account of the Employee's disability...."  *Id.*, at 1166.  In contrast,

15    the Policy here provides that Reliance is entitled to offset benefits that a claimant or her

16    dependents are eligible to receive because of her disability.  (AR at 17.)  This language is

17    distinguishable from the language at issue in *Carstens* and, thus, the Court finds *Carstens* is not

18    applicable here.  However, the Court concludes that Reliance has not met its burden to show the

19    amount of offset to which it is entitled.  Although Reliance points the Court to portions of the

20    record that reflect payments it made to Dr. Dimery, it calculated the off-set based on the amount

21    it previously deducted based on its *estimate* of SSDI benefits.  (*See* AR at 149, 223, 325-337.)

22    Indeed, Reliance argues that the amount of offset is "*approximately* $42,258.25."  (Def. Reply

23    Br. at 11:3 (emphasis added).)

24    Accordingly, although the Court concludes that Reliance is entitled to an off-set,

25    Reliance has not met its burden to establish the exact amount to which it is entitled.  Therefore,

26    the parties shall meet and confer to determine if they can come to an agreement about the

27    amount of offset.  The parties shall notify the Court by no later than April 30, 2012 as to

28    whether they have come to an agreement.  If they are unable to reach agreement, Reliance may

file a further motion with the Court documenting the amount due and owing.  Reliance shall notice its motion for hearing in accordance with Northern District Civil Local Rule 7, and the briefing schedule on the motion shall be governed by that rule.

### CONCLUSION

For the foregoing reasons, the Court GRANTS, IN PART, AND DENIES, IN PART, Dr. Dimery's motion for summary judgment and GRANTS, IN PART, AND DENIES, IN PART, Defendants' cross-motion for summary judgment.

**IT IS SO ORDERED.**

Dated: March 28, 2012

_____
JEFFREY S. WHITE
UNITED STATES DISTRICT JUDGE

**United States District Court**
For the Northern District of California